# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 3:13-CR-00017** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **CHARLES E. BROOKS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant Charles E. Brooks has filed a Motion to Suppress (Docket No. 40), to which the United States filed a Response in opposition (Docket No. 46). On January 22, 2014, the court held an evidentiary hearing concerning the motion. (Docket No. 63.) For the reasons stated herein, the motion will be denied.

## BACKGROUND

Based on the record before the court, including testimony and evidence presented at the January 22, 2014 suppression hearing, the court makes the following findings of fact:

The events relevant to this case took place at the "Fallbrook Apartments" in Nashville, Tennessee ("Fallbrook").[1] Fallbrook is privately owned by Alco Dellway Partners LP ("Alco"). Although Fallbrook is privately owned, many of its residents receive so-called "Section 8" housing benefits under 42 U.S.C. § 1437f.

As a condition of their lease agreements at Fallbrook, residents of Fallbrook must adhere to a set of "Community Rules," which include the following terms concerning conduct:

---

[1]At the suppression hearing, the parties also referred to Fallbrook as the "Dellway Villa Apartments." For ease of reference, the court will refer to the facility only as "Fallbrook."

5. Conduct

  a. The resident(s) on the Lease is responsible not only for their [sic] own actions but the conduct of his/her household members, guest(s), and visitor(s), while in the apartment or on the property. Any violation of these policies, and/or Lease terms is considered noncompliance with the Lease.
   . . . .

  c. Residents and his/her guest(s) will not engage in, or participate in, such conduct which interferes with the quiet and peaceful enjoyment of the other residents living in the apartment property. No act of a resident and/or guest which threatens, intimidates, is deemed as harassing others, is physically violent with or without injury to another person and/or property, or has unacceptable social conduct, will be tolerated. Residents are responsible for the conduct of their guests. If a guest creates a nuisance or otherwise disturbs other residents at the community, he or she will be required to leave the community immediately. Any such incident(s) will be considered a violation of the Community Rules and the Lease Agreement. Additionally, where applicable, such incidents will be reported to local law enforcement.

  d. Acts of intimidation, harassment, including sexual harassment, verbal abuse, physical threat or violence, or social misconduct of, or to, any employee of this apartment property by any person will not be tolerated. Any such incident(s) will be considered a violation of the Community Rules and the Lease Agreement. Additionally, where applicable, such incidents will be reported to local law enforcement.
   . . .

  g. *Management has the right to ban any person(s) from the premises that is involved in any criminal activity, including but not limited to drug and firearm activity . . . . Persons evicted for any reason, or who are placed on the criminal trespass list, are not permitted back on the property.* If Resident allows such a person to visit, it is grounds for immediate eviction.

(Docket No. 46, Ex. 5 (at pp. 3-4).) The Community Rules also contain a preamble stating that Fallbrook "was developed for the purpose of providing decent, safe, sanitary, and affordable housing," that "each resident is entitled to the exclusive use and enjoyment of their apartment in

2

a peaceful, quiet, and private environment," and that the rules "are not meant to infringe on the rights of any one resident but, rather, to protect the right of all the residents, the owners, managing agents, and the property as a whole." (*Id.* at p. 1.) The Community Rules state that "[a]ll City, County, State, and Federal Laws apply to each resident, their household members and all guest(s)." (*Id.*)

To enforce the Community Rules, Alco contracted with a private security firm, Tennessee Protection Agency ("TPA"), which provided security officers for Fallbrook during the relevant time frame.[2] Fallbrook also maintained a "Criminal Trespass List," which listed individuals who would not be allowed on the property because they had engaged in criminal activity or had otherwise engaged in disruptive activity that violated the Community Rules. (*See* Docket No. 46, Ex. 6 ("Criminal Trespass List").) The TPA security officers possessed a copy of the Criminal Trespass List, which was apparently updated on a rolling basis as necessary.

During the relevant time frame, TPA officers maintained a security checkpoint at the only roadway entrance to Fallbrook during the evening hours. As a general matter, TPA officers would stop cars at the checkpoint, ask for identification of the individuals in the car, and cross-reference those names against the Criminal Trespass List. If an individual in a car was on the Criminal Trespass List, TPA officers would have the individual step out of the car, at which point TPA officers would detain the attempted trespasser until a Metro Nashville Police Department ("MNPD") police officer arrived. Both sides of the gate at the checkpoint contained

---

[2]At some point before the events at issue in this case took place, the security guards at Fallbrook were employed by "Bear Security." Two witnesses at the evidentiary hearing suggested that Bear Security may have been a corporate predecessor of the TPA. For ease of reference, the court will refer to the security guards' employer only as the "TPA."

posted signs stating in large letters that "ALL PERSONS AND VEHICLES ENTERING THIS PROPERTY MAY BE SUBJECT TO SEARCH AT ANY TIME" and that "NO FIREARMS ALLOWED ON THIS PROPERTY." (*See* Trial Exhibits, Government's Exhibit 2.) The right side of the gate (from the perspective of an entrant) also contained posted signs stating "*NO TRESPASSING*" and "NOTICE TO VISITORS: ALL PERSONS ENTERING THIS PROPERTY SHOULD PROCEED DIRECTLY TO RESIDENT'S UNIT: NO LOITERING, TRESPASSING, GAMBLING OR ILLEGAL ACTIVITY IS PERMITTED IN THE COMMON AREAS. VIOLATORS WILL BE SUBJECT TO ARREST." (*Id.*)

The TPA did not, as a matter of course, share the Criminal Trespass List with the MNPD, nor did MNPD attempt to add names to that list. According to MNPD Officer Terry Denton, who was responsible for the East Precinct geographic area encompassing Fallbrook, his interactions with the Fallbrook facility were limited to situations in which the facility alerted him that someone was trespassing on its property. MNPD Lieutenant Doug Vinson, who supervises MNPD officers in the East Precinct , testified that the MNPD does not post officers at Fallbrook, although officers under his command do respond to calls for service related to it. Lieutenant Vinson testified that it is common knowledge that Fallbrook utilizes private security and that the property at Fallbrook is a high crime area. According to police records provided to the court, the MNPD received 4,667 emergency calls related to incidents at Fallbrook between September 18, 1998 and September 17, 2013. (*See* Trial Exhibits, Government's Exhibit 3, CAD Reports (reflecting dispatch calls).)

The record contains no evidence that TPA officers (either generally or specifically in this case) falsely identified themselves as public police officers, nor does the record contain evidence

that TPA officers' uniforms or conduct in any way violated applicable provisions of the

Tennessee Private Protective Services Licensing and Regulatory Act ("PPSLRA"), which is

discussed in the Analysis section herein. The record also indicates that, in compliance with the

PPSLRA, TPA security personnel received training classes in concealed weapons and other

security matters and that this training included instruction on how to make a "citizen's arrest,"

when an individual broke the law in the TPA officer's presence.

    The incident at issue in this case occurred on November 1, 2012. That night, TPA

Officers Charles Black and Smith[3] were running the checkpoint, checking the IDs of the

individuals attempting to enter the complex. At approximately 7 p.m., T.S. Springer (the driver),

Tashika Davis (a passenger in the front seat), and defendant Brooks (a passenger behind the

driver in the back seat) arrived at the checkpoint in a Chrysler Sebring. Davis was a resident of

Fallbrook. TPA Officers Black and Smith, who were standing together near a speed bump in

front of the gate, stopped the car and approached it, holding their flashlights. The car's driver's

side window was down, and the back seat window (closest to Brooks) was partially open.

Apparently before he or TPA Officer Smith had a chance to ask for IDs, TPA Officer Black (1)

saw Brooks unsuccessfully attempt to dispose of a "blunt" (a marijuana cigarette) by throwing it

out of the car window, and (2) smelled a marijuana odor coming from the car. Black heard

Brooks tell the driver of the car to "go, go, go," at which point Smith moved to place himself in

front of the car. Black then saw Brooks shuffling quickly from side-to-side within the back

passenger seat, attempting to disguise something in his hand by cupping it out of the officers'

line of sight. Black alerted Smith that Brooks had something in his hand, and Brooks therefore

---

[3]The court has not located Smith's first name in the record.

drew his weapon as a precautionary measure. Black placed his hand on his own weapon but did not draw it. According to Black, the car stopped. At this point, Black intended to detain the car's occupants until a Metro Nashville police officer could arrive to formally arrest Brooks.

At the same time that this incident was unfolding, MNPD Officer Denton was present at Fallbrook, where he was issuing an unrelated citation in the vicinity of the checkpoint. While he was issuing the citation, MNPD Officer Denton heard Black and Smith and the associated "commotion," at which point Denton moved to assist. Officer Denton arrived within a few seconds and shined his flashlight into the car. Denton shouted at the car's driver to place the car in park.[4] While Denton was shining his flashlight into the car, Officer Smith observed a bag of marijuana and pointed it out to Officer Denton.[5] Officer Denton, Black, and Smith removed the passengers from the car and handcuffed them.[6] Officer Denton formally arrested Brooks.

Another MNPD Officer, Michael Boguskie, arrived and conducted a probable cause search of the car. Upon searching the vehicle, he found the following items: (1) a sandwich bag containing approximately 53 grams of marijuana, (2) a small baggie containing approximately 0.5 grams of marijuana, and (3) a pistol visible in the car's rear floorboard on the driver's side,

---

[4]Officer Denton testified that the car began slowly moving forward after he approached it. TPA Officer Black did not corroborate this account: according to Black, the car remained stopped from the point at which TPA Officer Smith stood in front of it to block its path. The court credits Black's account of events as to this discrepancy.

[5]At the evidentiary hearing, Officer Denton recalled a slightly different sequence of events than did TPA Officer Black with regard to the bag of marijuana: Denton claimed to have seen the bag of marijuana himself as he approached. The court credits Black's recollection that he observed the bag in plain sight first and pointed it out to Denton, who then saw the bag in plain sight.

[6]Officer Denton removed Brooks from the car, Black removed Davis, and Smith removed Springer.

where Brooks had been seated.  Brooks was charged with possession with intent to distribute marijuana and with being a felon in possession of a firearm.

**MOTION TO SUPPRESS STANDARD**

The Fourth Amendment provides that "[t]he right of the people to be secure in their houses against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The Fourth Amendment therefore bars the government from conducting unreasonable searches and seizures.  *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008).  Where the Fourth Amendment applies, "searches 'conducted without a warrant issued upon probable cause [are] *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Moon*, 513 F.3d at 537 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  To redress and deter violations of the Fourth Amendment, courts apply the exclusionary rule and will suppress the fruits of an unconstitutional search or seizure.  *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

The Fourth Amendment, however, does not provide protection against searches by private individuals acting in a private capacity.  *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985) ("[T]he Fourth Amendment proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any government official.");  *United States v. Coleman*, 628 F.2d 961, 965 (6th Cir. 1980) ("[T]he Fourth Amendment proscribes only governmental action, and does not apply to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official");  *see also United States v.*

7

*Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996) ("Fourth Amendment protection against unreasonable searches and seizures 'is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual.'") (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010).       Although the Fourth Amendment typically applies only to governmental actors, courts have recognized that, under certain limited circumstances, searches and seizures by private entities may be imputed to the government.  Thus, "if the government coerces, dominates or directs the actions of a private person" conducting the search or seizure, the private person's search or seizure may be "transformed into a governmental search."  *Smythe*, 84 F.3d at 1242; *see also Day*, 591 F.3d at 683 (stating that a defendant must show that "an agency relationship exists" between the government and the private individual).  The inquiry is, essentially, "whether there is a sufficiently close nexus between the State and the challenged action of the [private actor] so that the action of the latter may be fairly treated as that of the State itself."  *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).  Ultimately, "whether a private individual's conduct is imputed to the government 'turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances'."  *United States v. Booker*, 728 F.3d 535, 541 (6th Cir. 2013) (quoting *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 614-15 (1989)) (internal quotation marks within quotation omitted).

<u>**ANALYSIS**</u>

**I.**     <u>**The Parties' Positions**</u>

In their written submissions and at oral argument, the parties have presented a grab bag of arguments.

As the court construes Brooks' position(s), Brooks argues that (1) TPA Officers Smith and Black (a) were performing a "public function" at Fallbrook, which function is subject to Fourth Amendment requirements under the "public function" test set forth by the Sixth Circuit in *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636-640 (6th Cir. 2006); and (b) seized Brooks without probable cause; and/or (2) that the TPA checkpoint was *per se* unconstitutional.

The government argues that the court should only apply the "agency" standard set forth by the Sixth Circuit in *Lambert*. The government argues that Brooks cannot meet this test or, if the court chooses to address it, the public function test.[7] The government also argues that no "seizure" occurred until Officer Denton approached the car, because the car continued to move and, therefore, did not surrender. Finally, the government argues that (1) even if the Fourth Amendment applies, the security checkpoint was not *per se* unconstitutional; and/or (2) even if the TPA Officers violated Brooks' Fourth Amendment rights, suppression of the evidence is not an appropriate remedy.

In sum Brooks' arguments – and the government's response thereto – focus on the TPA officers' conduct and authority at the Fallbrook security checkpoint, where the car was initially stopped. Brooks does not challenge the subsequent search of the car by the MNPD. Therefore, the court will similarly focus its analysis on whether, in stopping the car in which Brooks was riding, TPA Officers Black and Smith engaged in actions sufficiently attributable to the government to justify application of the Fourth Amendment.

## II.   Seizure

---

[7]At oral argument, Brooks argued that the circumstances presented also would satisfy the agency test, if the court were inclined to apply it.

"Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment," and "[p]assengers . . . are also considered seized during a traffic stop."  *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012); *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990) (vehicle stop at police sobriety checkpoint constitutes a "seizure" within the meaning of the Fourth Amendment); *Delaware v. Prouse*, 440 U.S. 648, 654 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief.").

The court finds as a matter of fact that the car stopped at the checkpoint and that the car was stopped when MNPD Officer Denton approached it.  Therefore, the court rejects the government's position that, if the Fourth Amendment applies, no seizure actually occurred because the car never "surrendered" to the TPA officers at the checkpoint.  The evidence shows that TPA Officer Smith blocked the car's path, and the court credits TPA Officer Black's recollection that the car did not move after Smith stood in its path upon learning that its occupants were engaged in potentially criminal activity and may have been attempting to speed away.  Thus, if the Fourth Amendment applied to their conduct, Smith and Black "seized" Brooks and the other passengers in the car by stopping them at the security checkpoint.  *Cf. United States v. Seymour*, — F. 3d — , 2014 WL 128120, at *4 (6th Cir. Jan. 14, 2014) (finding that passenger was not seized during traffic stop, where passenger leaped out of vehicle before it came to a complete stop).  Indeed, Brooks himself has argued that he was seized and "arrested" by the TPA Officers.  Of course, the fact of a seizure merely begs the questions that the court must resolve: can Smith and Black's actions in stopping the vehicle be imputed to the

government for Fourth Amendment purposes and/or was the security checkpoint unconstitutional *ab initio*?

III.     **The Public Function Test and the _Lambert_ Agency Test**

The parties have introduced multiple proposed "tests" to determine whether the Fourth Amendment applied to the actions of the TPA Officers, but they have provided little guidance to the court as to why the court should apply one test over another.  The parties' confusion in this regard is understandable, because federal caselaw reflects a polyglot of approaches to the state action inquiry, many of which gloss over, or explicitly decline to address, some confounding issues left unresolved by the Supreme Court in this area of the law.  *See, e.g., Romanski*, 428 F.3d at 632 (stating that Supreme Court developed three tests for determining the existence of "state action" for purposes of § 1983 – the "public function" test, the "state compulsion" test, and the "symbiotic relationship test"); *Lambert*, 752 F.2d at 227 (articulating an "agency" test in context of motion to suppress in criminal case); *Day*, 591 F.3d 683 (in a criminal case involving a motion to suppress, applying both *Lambert*-like "agency test" from criminal cases and *Romanski* § 1983 "public function" test, and acknowledging but declining to address whether it was appropriate to apply a "a 'free-standing' public function test or to utilize such a test as part of analyzing the first factor of the agency test"); *see also State of New Mexico v. Santiago*, 217 P.3d 89, 83 (N.M. 2009) (construing Fourth Amendment) (in addressing motion to suppress, applying both *Lambert*-like agency test and *Romanski* "public function" test, but noting that "[o]ur courts have not previously applied the public-function doctrine in the context of the Fourth Amendment, and we have found only limited authority from other jurisdictions that have done so.").  Here, the parties essentially argue past each other as to which of these tests should

apply, without fully addressing these difficult doctrinal issues.

As the best the court can discern, courts apply the state action test or tests that best fit the factual circumstances presented.  For example, in *Romanski*, the Sixth Circuit addressed whether a private casino could be held liable under § 1983 when its security guards allegedly arrested the plaintiff without probable cause.  428 F.3d at 632.  The plaintiff had picked up a five-cent token left at a slot machine, at which point a plain-clothes private casino security officer detained her for violating an un-posted casino policy against picking up tokens.  *Id.* 632-33. When the plaintiff protested, the officers escorted her to a windowless "security office," where they copied the plaintiff's license and social security card, photographed her, and removed a nickel from her winnings.  *Id.* at 633.  The officers chose to eject the plaintiff from the casino, but refused the plaintiff's request to collect her friends at a lunch buffet (where they were eating), and refused to permit the plaintiff to use the bathroom without being accompanied by a security officer.  *Id.* at 633-34.  The casino notified the Michigan State Police about the incident, but otherwise the police had no role in it.  *Id.* at 634.  Under these circumstances, the Sixth Circuit applied the "public function" test, which seeks to determine whether a private entity (here, the casino security team) performs a public function by "exercising powers traditionally reserved to the state."  *Id.* at 637.  The Sixth Circuit determined that Michigan's plenary delegation of its police power to the casino security guards satisfied the "public function" test, meaning that those guards constituted "state actors" for purposes of § 1983.  *Id.* at 636-640.[8]  Following *Romanski*, some courts, including the Fourth Circuit, have applied the *Romanski* public function test in

---

[8]The Sixth Circuit's reasoning for this conclusion is discussed in a later section of this opinion detailing how the public function test applies to the TPA Officers.

criminal cases in which the actions of private security officers are challenged as *per se* attributable to the government. *See, e.g.*, *Day*, 591 F.3d at 687-89 (private security officers at a private housing complex); *Santiago*, 217 P.2d at 86-87 (private mall security officers).

By contrast, in *Lambert*, the Sixth Circuit addressed whether a housekeeper's retrieval of inculpatory evidence from the defendant's home and provision of that evidence to the Federal Bureau of Investigation was subject to the Fourth Amendment. *Id.* at 89. Briefly, a housekeeper claimed that the homeowner and his friends had openly used illegal drugs in front of her; concerned about the negative effects of drug use, she approached the FBI 25 times concerning the homeowner's activities. *Id.* at 86. Despite the FBI's explicit instructions not to remove objects from the house, the housekeeper removed a thermos containing a white powder that she (correctly) believed was cocaine, which she furnished to the FBI. *Id.* at 87. The defendant argued that this evidence should be suppressed because the housekeeper had violated his Fourth Amendment rights. *Id.* at 89. Under the circumstances, the Sixth Circuit applied an "agency" test to determine whether (1) "the police instigated, encouraged or participated in the search," and (2) the housekeeper "engaged in the search with the intent of assisting the police in their investigative efforts." *Id.* (citing *United States v. Howard*, 752 F.2d 220, 227 (6th Cir. 1985)). Concluding that the FBI had not instigated, encouraged, or participated in the search, the court held that the housekeeper's search was a "private search" not subject to the purview of the Fourth Amendment. *Id.*; *see also United States v. Hardin*, 559 F.3d 404 (6th Cir. 2007) (where agents ordered apartment manager to determine if suspect was located at a particular residence, without which agents would have lacked probable cause, apartment manager's search in compliance with agent's demands constituted state action); *Howard*, 752 F.2d at 227-28

(insurance company investigator did not act as an "agent of the government," where the investigator entered property in the interest of determining liability of the insurance company with respect to suspected arson).

As *Romanski* and *Lambert* indicate, it does not appear that one test is meant to be exclusive of the other; rather, the facts of each case influence the proper test to apply. Having canvassed the cases cited by the parties here, it may be that the *Lambert* agency test applies where a private actor *who otherwise would not be subject to the Fourth Amendment* engages in specific activity functionally attributable to the government, whereas the *Romanski* public function test applies more appropriately to situations in which a party claims that a *class* of people – such as casino security guards – constitute state actors by virtue of the function they perform.[9]

Furthermore, the government has not presented a meaningful basis for its position that the court should decline to apply the "public function" test because *Romanski* was a § 1983 case. As the Fourth Circuit noted in *Day*, the Supreme Court has held that the § 1983 "under color of

_____

[9]As the Seventh Circuit observed in *Wade v. Byles*, 83 F.3d 902 (1996) – a case cited approvingly by the Sixth Circuit in *Romanski* – :

> The Supreme Court has taken a flexible approach to determining when a state is responsible for the acts of private persons, adopting a variety of "tests" dependent on the particular facts of each case. The factual circumstances supporting a finding of state action, however, can generally be categorized into two broad groups. The first group includes situations where a state effectively directs, controls, or encourages the actions of a private party. In these cases, a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. . . . [The plaintiff] predicates his claim of state action on the second general scenario, in which a state delegates a "public function" to a private entity.

*Wade*, 83 F.3d at 905 (internal citations and quotations omitted).

law" inquiry mirrors the "state action" requirement of the Fourteenth Amendment. *Day*, 591

F.3d at 691 (citing *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922 (1982)). The Due Process

Clause of the Fourteenth Amendment made the Fourth Amendment applicable to the states.

*United States v. Booker*, 728 F.3d 535, 545 (6th Cir. 2013). Here, the government, citing to a

Ninth Circuit case, simply points out that the Fourth Amendment is not triggered simply because

of the existence of "state action." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912,

924 (9th Cir. 2001). That is not a controversial proposition: in *Arpin*, the Ninth Circuit was

merely pointing out that, notwithstanding a finding of "state action" for purposes of § 1983, the

Fourth Amendment would not apply unless the underlying "state action" at issue involved a

"search" and/or "seizure" – *i.e.*, the types of government conduct to which the Fourth

Amendment protection against unreasonable searches and seizures applies. *Id*. Here, there was

a "seizure" of Brooks, which would trigger Fourth Amendment protections (via the Fourteenth

Amendment) if the security officers who seized Brooks were performing a public function and/or

otherwise acting as agents of the MNPD or the State of Tennessee. In sum, if there is any

meaningful reason why the court should *not* consider the § 1983 state action standard articulated

by the Sixth Circuit in *Romanski* under the circumstances presented here, the government has not

adequately articulated it.

Here, the public function test seems to best fit the factual circumstances at issue. Be that

as it may, the court need not resolve whether one test or the other (or both) is the "right" one,

because the facts satisfy neither test for the reasons stated in the next section. Therefore, as other

courts have done under similar circumstances, the court will assume *arguendo* that it is

appropriate to analyze the actions of private security guards in a criminal case under both the

public function and the agency tests. *See, e.g., Day*, 591 F.3d 679; *Santiago*, 147 N.M. at 82-88.

## IV.    Burden of Proof

The government has identified multiple Sixth Circuit decisions indicating that, when a

defendant argues that a private party's actions should nevertheless be treated as government

action for purposes of the Fourth Amendment, the burden of proving state action for Fourth

Amendment purposes rests on the defendant. *See, e.g.*, *United States v. Freeland*, 562 F.2d 383,

385 (6th Cir. 1977) ("Where a motion to suppress evidence has been made, the burden of

establishing that the evidence was secured by an unlawful search is on the moving party.  It was

thus incumbent upon Freeland to demonstrate that sufficient governmental involvement existed

to invoke the proscriptions of the Fourth Amendment."); *United States v. Coleman*, 6528 F.2d

961, 965 (6th Cir. 1980) ("To establish an unlawful search here, [the defendant] must

demonstrate that the search was not a private search even though [a private person] alone

actively searched the truck."); *see also Day*, 591 F.3d at 683 (where defendant contends that a

private party acted as a state actor for Fourth Amendment purposes, defendant bears the burden

to prove the requisite agency relationship between the individual and the government).   Brooks

has not identified any contrary legal authority.  Therefore, the court finds that the burden is on

Brooks to demonstrate that the TPA security officers' conduct, and/or that the checkpoint itself,

fell within the scope of the Fourth Amendment.[10]

## III.    Whether the Seizure by TPA Officers Smith and Black Constituted State Action

---

[10]Although the court proceeds under this assumption, the court would have reached the
same conclusion if the burden had been placed on the government.  As explained herein, the
preponderance of the evidence establishes that the Fourth Amendment is inapplicable to the TPA
Officers' conduct.

### A.    *Lambert*/Agency Test

Under the *Lambert* test, Brooks must show that (1) the MNPD instigated, encouraged or participated in the seizure by TPA Officers Smith and Black, and (2) that TPA Officers Smith and Black "engaged in the [seizure] with the intent of assisting the police in their investigative efforts."  771 F.2d at 89.  Here, Brooks has not made either showing.

First, in stopping the car on the night in question, Smith and Black effectuated a stop that, subject to the state action requirement, would otherwise constitute a "seizure" under the Fourth Amendment.  Officers Smith and Black did not conduct the stop at the instigation or encouragement of law enforcement; instead, they did so in the normal course of their duties as TPA security personnel, who were charged with enforcing the Criminal Trespass List on behalf of Alco at Fallbrook.  Although the MNPD may generally have been aware of TPA's work as a security firm at Fallbrook, the fact that MNPD responded when TPA alerted them to criminal violations occurring at Fallbrook does not establish "encouragement" – it merely establishes that the MNPD was fulfilling its obligation to respond to complaints from private citizens and property owners about criminal activity.  Although Officer Denton happened to be in the area when Smith and Black stopped the car, it was Smith and Black who seized the car in the first instance, without any involvement or encouragement from Officer Denton.  Indeed, after Black ascertained that a crime had been committed in his presence (marijuana possession) and witnessed Brooks making furtive moves in the car's back seat, Black had Smith step in the path of the car to prevent its escape and to detain it until law enforcement could arrive to effectuate a formal arrest.  Neither Denton nor the MNPD "instructed or encouraged" the TPA officers to seize cars attempting to enter Fallbrook, nor did they instruct, encourage, or participate in the

TPA officers' initial decision to stop the car at the checkpoint and their subsequent decision to detain it upon realizing that illegal and perhaps dangerous activity was taking place in their presence. *See Lambert*, 771 F.2d at 89.

Second, the evidence shows that Officers Smith and Black were not seeking to assist the police in crime prevention and investigation efforts when (1) they stopped the car at the checkpoint as a matter of course, and (2) after seeing evidence of plain sight illegal activity committed by Brooks and/or others in the car (as well as suspicious movements by Brooks in the back seat thereafter), seizing the car by blocking its path until a formal arrest could be made. The evidence shows that, in stopping the car at the checkpoint and in detaining the car thereafter, Officers Smith and Black were enforcing *their employer's* interest in enforcing the Criminal Trespass List and in keeping Fallbrook free from trespassers and criminal activity on the premises, in compliance with the Community Rules. Again, the fact that the MNPD may have been aware that TPA utilized a checkpoint for these purposes and often alerted the MNPD to criminal activity does not establish that the TPA (and, by extension, Alco) primarily intended to assist the MNPD's general interest in investigating crimes.. "[W]here . . . the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, . . . the private party is not an agent of the government." *Howard*, 752 F.2d at 227.

### B. Public Function Test

#### 1. *Romanski* and the "Line" Between *Payton* and *Wade*

Under the public function test, a private entity is said to be performing a public function if it is exercising powers traditionally reserved to the state, such as holding elections, taking

private property under the eminent domain power, or operating a company-owned town. *Romanski*, 428 F.3d at 636. As the Sixth Circuit has observed, the Supreme Court has expressly left open the question of whether and under what circumstances private security officers may be said to perform a public function for purposes of § 1983. *Id.* (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978)). Nevertheless, the Sixth Circuit and other circuit courts have found that, under appropriate circumstances, private security guards can perform a "public function" subject to the Fourth Amendment. *See Romanski*, 428 F.3d at 640; *see also Payton v. Rush-Presbytarian*, 184 F.3d 623, 627-30 (7th Cir. 1999) (special police officers with plenary police powers); *Henderson v. Fisher*, 631 F.2d 1115 (3d Cir. 1980) (university policeman with plenary police authority throughout campus); *cf. Day*, 591 F.3d at 687-689 (private security guards at apartment complex did not perform a public function, where Virginia granted security guards arrest authority that was "circumscribed" and "essentially the same as that of any private citizen").

In *Romanski*, the Sixth Circuit considered the application of the public function test to private security guards at a casino in Michigan. The Sixth Circuit looked to the Seventh Circuit decisions in *Payton v. Rush-Presbyterian - St. Luke's Med. Ctr.*, 184 F.3d 623, 628 (7th Cir. 1999) and *Wade v. Byles*, 83 F.3d 902, 905-906 (7th Cir. 1996), as providing persuasive guidance as to the "line" beyond which private security guards may be considered state actors. In *Payton*, the Seventh Circuit had considered whether private individuals designated as "special police officers" under Chicago city ordinances could be held liable as state actors while performing security functions at a Chicago-area hospital. 183 F.3d at 625-630. The ordinances at issue vested the special police officers with "*the powers of the regular police patrol* for which

they are respectively appointed or in the line of duty for which they are engaged," and required those officers to "conform to and be subject to *all rules and regulations governing police officers of the city*." *Id.* at 625 (emphases added). Under the circumstances, the court found that the special police officers at issue were "de facto police on [the defendant's] premises" and that "no legal difference exists between a privately employed special officer with full police powers and a regular Chicago police officer," thereby qualifying them as state actors subject to constitutional constraints. *Id.* at 630.

By contrast, in *Wade*, the Seventh Circuit had held that private security guards under contract with the Chicago Housing Authority (the "CHA," a governmental entity) did not engage in state action. 83 F.3d 903-04. There, the CHA provided security for residents of its housing projects (*i.e.*, government-affiliated housing projects), through (1) a CHA-maintained police force whose jurisdiction was limited to CHA property, but who were "statutorily vested with all the powers of city and state police"; (2) CHA's own in-house armed security guards; and (3) private security guards with whom the CHA contracted to provide security for the lobbies of CHA buildings. *Id.* The primary responsibility of the private security guards was to control access to the CHA buildings by monitoring the identification of people entering and leaving the buildings. *Id.* at 904. If a guest did not show proper identification or refused to sign in, the private security guards could ask the person to leave and, if the person refused, they would call the police and either wait for police to arrive or arrest the individual for criminal trespass pending police arrival. *Id.* The private security guards were permitted to carry firearms, permitted to use deadly force in self-defense, had limited arrest authority, and could exercise their limited powers only in the building lobbies. *Id.* The Seventh Circuit observed that the

security guards "possessed powers no greater than those of armed security guards who are commonly employed by private companies to protect private property." *Id.* at 906. The court also observed that private citizens generally possessed power to carry a gun, the power to arrest someone for criminal trespass pending arrival of the police, and the power to use deadly force in self-defense, meaning that those were not powers exclusively reserved to the police. *Id.* Accordingly, the court found that the CHA officers were not state actors for purposes of § 1983. *Id.* at 906-07.

Examining *Payton* and *Wade*, the Sixth Circuit in *Romanski* characterized *Payton* as exemplifying the proposition that, "[w]here security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test." *Romanski*, 428 F.3d at 637. The Sixth Circuit characterized *Wade* as exemplifying the "other side of the line," in which the private defendants have some police-like powers but not plenary police authority. *Id*.

The casino security officers at issue in *Romanski* operated pursuant to a Michigan statute granting them "the authority to arrest a person without a warrant as set forth for public peace officers." *Id.* at 638 (quoting Mich. Comp. Laws § 338.1080). The Sixth Circuit construed the Michigan statute as delegating "plenary police power" to private security guards at the casino, because (subject to geographic limits) the security guards had been vested with essentially the same arrest powers as the police, without any qualitative limits. *See* 428 F.3d at 639 n.3 (stating that, in Michigan, "a licensed private security officer's arrest power is plenary in the sense that while on her employer's property during working hours, a private security officer can make warrantless arrests *to the same extent as a public police officer*") (emphasis added).

21

Accordingly, the Sixth Circuit concluded that the circumstances presented in *Romanski* "fall[] on the *Payton* side of the line," meaning that the casino security guards performed a public function subject to constitutional constraints. *Id.*

### 2. Application

Here, the dividing line identified by the Sixth Circuit in *Romanski* compels a finding that the TPA security officers at Fallbrook were not state actors.

Security guards in Tennessee, including the TPA officers here, operate under the PPSLRA, which sets forth licensing requirements and restrictions for certain forms of private security. *See generally* Tenn. Code Ann. § 62-35-101 *et seq.* The PPSLRA applies to, *inter alia*, "security and patrol guard service," defined as "protection of persons or property, or both, from criminal activities, including, but not limited to: (A) Prevention or detection, or both, of intrusion, unauthorized entry, larceny, vandalism, abuse, fire or trespass on private property; (B) Prevention, observation or detection of any unauthorized activity of private property; (C) Enforcement of rules, regulations or local or state laws on private property; [and] (D) Control, regulation or direction of the flow or movements of the public, whether by vehicle or otherwise[,] on private property." *Id.* § 62-35-102(16)(A)-(D). Security firms and security officers subject to the PPSLRA must register with and be approved by the state, subject to training and examination requirements, including special additional training for armed security guards. The PPSLRA contains multiple provisions specifically barring security guards from engaging in activities that could give the false impression that the guards are public peace officers. For example, § 62-35-127 proscribes the following conduct:

> While performing any function of a security guard and patrol service, no person shall:

(1) Wear or display any badge, insignia, shield, patch, or pattern that:
- (A) Indicates or tends to indicate that the person is a sworn peace officer;
- (B) Contains or includes the word "police" or the equivalent of the word "police"; or
- (C) Is similar in wording to any law enforcement agency in this state; or

(2) Have or utilize any vehicle or equipment that:
- (A) Displays the word "police", "law enforcement officer", or the equivalent of those words; or
- (B) Has any sign, shield, accessory or insignia that may indicate that the vehicle or equipment belongs to a public law enforcement agency.

Similarly, under Tenn. Code Ann. § 62-35-128:

No security guard shall wear any military or police-style uniform, except for rainwear or other foul-weather clothing, unless the uniform has:

(1) Affixed over the left breast pocket on the outermost garment and on any cap a badge or insignia distinct in design from that utilized by any law enforcement agency in this state, unless the licensed security officer is in plain clothes; and

(2) Affixed over the right breast pocket on the outermost garment a name plate or tape with the name of the security guard/officer on it, unless the licensed security officer is in plain clothes.

Moreover, the PPSLRA makes it unlawful "for any contract security company to publish any advertisement, letterhead, circular, statement or phrase of any sort that suggests that the company is a government agent or instrumentality" or to "[m]ake any statement that would reasonably cause another person to believe that the security guard/officer functions as a sworn peace officer or other government official." *Id.* § 62-35-134(b). Here, there is no indication in the evidentiary record that Smith, Black, or the TPA generally violated any provision of the PPSLRA.

Although Brooks attempts to analogize the PPSLRA to the Michigan statute at issue in *Romanski*, the comparison is fundamentally flawed. Unlike the Michigan statutory scheme, the

PPSLRA does not purport to grant "plenary arrest power" to private security guards. Indeed, Tennessee has a broad "citizen's arrest" statute, which permits private citizens to make arrests under the following circumstances:

> A private person may arrest another: (1) For a public offense committed in the arresting person's presence; (2) When the person arrested has committed a felony, although not in the arresting person's presence; or (3) When a felony has been committed, and the arresting person has reasonable cause to believe that the person arrested committed the felony.

Tenn. Code Ann. § 40-7-109.[11] Thus, under Tennessee law, private citizens possess *some* arrest powers, including the authority to arrest another person who commits "a public offense" in that person's presence, without regard to whether the offense constitutes a felony or misdemeanor. Accordingly, construing the PPSLRA and the Tennessee citizen's arrest statute in harmony, private security guards possess the same power to arrest as *private citizens* in Tennessee. *See* Tenn. Op. Atty. Gen. No. 03-018, 2003 WL 912608, at *4 (Feb. 19, 2003) ("Arrest powers for security officers exist only as they do for private citizens").[12] In sum, under Tennessee law, certain arrest powers, including the authority to arrest another person for committing a crime in

---

[11]Section 109 implements Tenn. Code Ann. § 40-7-101, which states that an arrest may be made either by (1) An officer under a warrant; (2) An officer without a warrant; or (3) A private person.

[12]This February 19, 2003 opinion from the Tennessee Attorney General, which the court finds to be persuasive, contains a detailed analysis of the PPSLRA and the Tennessee citizen's arrest statute that largely tracks this court's analysis. *See* 2003 WL 912608, at *3-*6. Among other things, the opinion states the following conclusions related to the PPSLRA and the citizens's arrest statute: (1) "[s]ecurity guards are not law enforcement officers"; (2) "[f]ar from being required to provide official authority, therefore, security guards are, in actuality, prohibited from holding themselves out as government agents; (3) "[a]rrest powers for security officers exist only as they do for private citizens"; (4) "[i]f a private person or a security guard searches a person that he or she has arrested, the [federal] constitution is not implicated"; and (5) "[s]ecurity guards and private persons are not governmental officials." *Id.*

that person's presence, are *not exclusively reserved* to public peace officers – and it is those non-exclusive police powers that private security guards may exercise. Furthermore, subject to restrictions specifically preventing them from identifying or otherwise giving the impression that they are public officers, the PPSLRA authorizes private security officers to prevent and detect "unauthorized entry," "trespass," and "unauthorized activity" on private property, as well as the enforcement of "rules" and the "flow or movements of the public, whether by vehicle or otherwise" on private property.

Coming back to the *Romanski* analysis, it is clear that TPA officers (and private security guards within Tennessee more generally) do not possess "plenary arrest power." Moreover, the circumstances here are even less indicative of state action than *Wade* (the Seventh Circuit decision that the Sixth Circuit construed as appropriately finding a lack of state action), where the security guards at issue conducted necessary security functions at a *public housing facility* owned and operated by a city government entity, the CHA. Here, the TPA officers manned a checkpoint at a *private* facility owned and operated by a private entity, not a public one.[13] Furthermore, the TPA officers were tasked with enforcing the Community Rules, which included preventing "trespassers" from entering the (private) property after those individuals had broken the Community Rules and the associated lease terms – perhaps, but not necessarily, by committing a crime on the Fallbrook grounds. The record contains no indication that the TPA officers violated the requirements of the PPSLRA. Moreover, the gates openly disclosed that

---

[13]Brooks has pointed out that an unspecified percentage of the Fallbrook residents receive federal subsidies for their rental payments to Alco. However, Brooks has not meaningfully argued, let alone shown, that the fact that some Fallbrook residents receive subsidies to pay rent to the private property owner has any bearing on the court's public function analysis.

anyone entering the property was subject to search, that the property owner reserved the right to exclude trespassers, and that illegal activity of any kind was forbidden on the property.

In sum, the TPA officers exercised essentially the same non-exclusive police powers as private citizens in Tennessee, and the record does not show that the TPA officers somehow held themselves out as public peace officers at the checkpoint, or that Alco in any way sought to encourage that impression. Under the circumstances, the mere fact that Tennessee law required the TPA officers to register with the state and receive specialized training (among other prerequisites) is insufficient to establish that the TPA officers were performing "public functions" exclusively reserved to the state of Tennessee.

Accordingly, the court finds that TPA Officers Black and Smith, in operating the security checkpoint, were not acting as governmental actors subject to the Fourth Amendment.

C. **Whether the Fallbrook Security Checkpoint Was *Per Se* Unconstitutional**

In reliance on the Tennessee Supreme Court decision in *State v. Hayes*, 188 S.W.3d 505 (Tenn. 2006), Brooks argues that the security checkpoint at Fallbrook was *per se* unconstitutional.

In *Hayes*, the federally subsidized Chattanooga Housing Authority ("CHA"), a governmental entity, operated a public housing facility called Poss Homes. *Id.* at 508. According to the Tennessee Supreme Court, "[t]he CHA operates its own police department, *which has full concurrent jurisdiction with the Chattanooga Police Department inside Poss Homes*." *Id.* at 508 (emphasis added). The CHA issued special identification badges to Poss Home residents. *Id.* CHA officers maintained a security checkpoint at a "thoroughfare that had been 'ceded' to the CHA by the City of Chattanooga." *Id.* at 509. The CHA officers claimed

that the checkpoint was established simply for checking IDs to see whether individuals lived at Poss Homes. *Id.* at 508-509. The evidence indicated that CHA officers may have selectively enforced this policy, because it operated the checkpoint "about two to three times a week . . . at random . . .usually late afternoon," and officers "'usually' stopped both motorists and pedestrians." *Id.* at 509. The evidence also showed that CHA officers did more than simply check for CHA-issued ID badges; instead, the defendant's arresting officer testified that, even after checking those IDs, he would typically ask for a driver's license, and "sometimes for registration and insurance, and after that I would make a decision on what I was going to do." *Id*. at 509.

Analyzing these facts, the *Hayes* court concluded that the checkpoint was unconstitutional under both the Fourth Amendment (to the United States Constitution) and under the Tennessee Constitution. The court looked to the line of cases dealing with the narrow categories of circumstances under which the *government* may establish targeted security checkpoints and/or roadblocks on the roadways at which cars may be "seized" without probable cause. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 545 (1976) (brief, suspicionless seizures of motorists at Border Patrol checkpoints permissible); *Sitz*, 496 U.S. at 455 (upholding sobriety checkpoints aimed at removing drunk drivers from the road); *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (suggesting that a roadblock aimed at verifying drivers' licenses and vehicle registrations would be permissible in pursuit of highway safety). The *Hayes* court also cited *City of Indianapolis v. Edmond*, 531 U.S. 31, 48 (2000), for the proposition that "roadblocks aimed at general crime control contravene the Fourth Amendment." *Hayes*, 188 S.W.3d at 512 (citing *Edmond* [no pinpoint citation]); *see Edmond*, 531 U.S. at 48 (declining to

approve state police roadblocks "whose primary purpose is ultimately indistinguishable from the general interest in crime control").  Essentially, the *Hayes* court concluded that the CHA's security checkpoint constituted an effort by the government to engage in general crime prevention by stopping people without probable cause, a practice which the court therefore found to be unconstitutional under *Edmond.  See Hayes*, 188 S.W.3d at 512-513.

Crucially, whether the CHA officers were governmental actors for Fourth Amendment purposes *was not at issue* in *Hayes*; that is, the parties and the court in that case appear to have agreed that the Fourth Amendment applied to the CHA officers.  That assumption is understandable and entirely consistent with the *Romanski* "public function" analysis, because the CHA officers in *Hayes* (1) worked for a public entity at a public facility and (2) exercised police power *concurrent* with the powers of the local Chattanooga police force – *i.e.*, the type of "plenary police power" that, under *Romanski*, compels application of the Fourth Amendment to any searches conducted by those officers.

Thus, although *Hayes* addresses the constitutionality of public police checkpoints focused on general crime deterrence at public housing facilities, *Hayes* does not address the threshold issue presented here, which is whether *private* security guards operating a security checkpoint on *private* residential property were government actors for purposes of the Fourth Amendment.  Therefore, as to that threshold issue, *Hayes* is entirely inapposite.

Because the court has found that the TPA officers at Fallbrook are not state actors, the court need not address (as the *Hayes* court did) whether the Fallbrook checkpoint constituted a constitutionally impermissible attempt by the police to engage in general crime deterrence by seizing and/or searching people without probable cause.  Accordingly, the court expresses no

opinion about the persuasiveness of the *Hayes* court's analysis with respect to government-affiliated checkpoints at public housing facilities in Tennessee.[14]

### D.        Summary

In sum, the court finds that the initial seizure of the car by TPA Security Guards Black and Smith at the checkpoint did not implicate the Fourth Amendment.  Accordingly, Black and Smith were permitted to stop the car in which Brooks was riding (as they did with all cars attempting to enter Fallbrook that night) to check the identification of its occupants against the Criminal Trespass List.

Finally, although the parties have devoted short shrift to the constitutionality of the evidence uncovered following the routine stop by TPA Officers Black and Smith, the court observes that the remaining evidence was lawfully gathered.  Once Black observed Brooks' attempt to throw a marijuana cigarette out of the back window and smelled marijuana, Black had sufficient cause to support a "citizen's arrest" of Brooks and the other passengers under Tennessee law – a point that Brooks does not appear to dispute.  At the time, Brooks, likely realizing his predicament, shouted at the driver to "go, go, go" in an effort to evade the TPA

---

[14]The court notes that, even it were the case that the Fourth Amendment governed the TPA checkpoint at issue here, the circumstances in *Hayes* tended to show that the CHA officers in *Hayes* were in fact seeking to advance general crime deterrence, rather than simply advancing the (public) property owner's goals in preventing trespassers.  For example, as the Tennessee Supreme Court observed, although the CHA officer in *Hayes* claimed that the CHA was merely interested in preventing trespassers from entering the property, the officer in practice did not limit his inquiries to checking for property-specific ID badges; instead, the officer often demanded information including a driver's license, registration, and insurance information, all of which were more consistent with general crime deterrence than with a narrower interest in preventing trespassers.  Here, Brooks has not shown that the TPA officers similarly sought to engage in general crime deterrence, rather than simply enforcing Fallbrook's "Criminal Trespass List."

officers, but Brooks and Smith prevented the car from moving. By happenstance, MNPD Officer Denton was in the area and approached the car just a few seconds after this series of events. By that time, Black had already determined that Brooks had committed a crime in his presence (marijuana possession, at least). Black then saw a bag of marijuana in plain sight and pointed it out to Officer Denton, after which Black and Smith assisted Denton in formally arresting Brooks. Testimony at the hearing indicated that the evidence discovered during the subsequent search of the car was in plain sight and, therefore, not subject to the warrant requirement. *See Texas v. Brown*, 460 U.S. 730, 740 (1983) (no legitimate expectation of privacy in objects that would be entirely visible to officer as a private citizen); *United States v. Witherspoon*, 82 F.3d 697, 699 (6th Cir. 1996). Regardless, given that TPA Officer Black had witnessed Brooks attempt to dispose of a marijuana cigarette and saw him shifting around in the backseat attempting to hide something else from the TPA Officers – perhaps additional evidence of drug possession – it was reasonable to believe that a search of the vehicle following Brooks' arrest would yield evidence relevant to Brooks' arrest for drug possession. *See Arizona v. Gant*, 556 U.S. 332, 347 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity [related to the arrest], *United States v. Ross*, 456 U.S. 798, 820-821 [] (1982), authorizes a search of any area of the vehicle in which the evidence might be found.")

Because the court will deny the Motion to Suppress for the reasons stated herein, the court need not reach the government's alternative argument that, even if a Fourth Amendment violation occurred, suppression is not warranted.[15]

---

[15]The court notes that the government has incorporated arguments it made to the Fourth Circuit in *United States v. Day*, which contain some potentially compelling policy reasons why suppression would not otherwise be warranted here. (Docket No. 46 at pp. 13-15 (quoting

## CONCLUSION

For the reasons stated herein, Brooks' Motion to Suppress will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

government's appellee brief in *United States v. Day*, 2009 WL 832929 (4th Cir. Cir.).)